UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| PARADIGM BUSINESS PARK, LLC, Plaintiff, vs. INTERSTATE POWER SYSTEMS, INC., LIEBHERR-AMERICA, INC., Defendants. | 4:25-CV-04223-RAL OPINION AND ORDER GRANTING MOTION TO TRANSFER VENUE |

On November 14, 2025, Plaintiff Paradigm Business Park, LLC (Paradigm) filed this lawsuit against Defendants Interstate Power Systems, Inc. (Interstate) and Liebherr-America, Inc. (Liebherr). Doc. 1. The Complaint sought immediate injunctive relief, which this Court denied without prejudice to bringing a similar motion in the future. Doc. 3. Interstate filed a Motion to Transfer or, in the Alternative, to Dismiss, Doc. 15, and Liebherr filed a Motion to Dismiss, Doc. 23. Paradigm opposes these motions, Docs. 26, 30, and filed a Motion to Amend its Complaint (that it wants granted only if doing so preserves venue in the District of South Dakota), Doc. 27, and a renewed Motion for Permanent Injunction, Doc. 34. Defendants oppose Paradigm's motions, though Interstate does not oppose a limited injunction to prevent behavior Paradigm fears occurred but Interstate and Liebherr aver did not, and technologically, cannot occur. Docs. 31, 32, 45, 46. This Court held a motion hearing on April 24, 2026, during which it heard argument from counsel on all pending motions and testimony from two witnesses for Paradigm on its injunction

1

request. Doc. 56. This Court grants Interstate's Motion to Transfer for the reasons explained below and defers to the transferee court to rule on the remaining motions.

## I.  Facts

Paradigm is a South Dakota limited liability company with its principal place of business in Yankton, South Dakota. Doc. 1 ¶ 1. Paradigm owns and develops real estate and has a sand and gravel production business. Id. At the hearing, Paradigm's founder and President Randy Golden testified that through the years, Paradigm has owned and operated twenty-two pieces of Liebherr equipment. Interstate is a Minnesota corporation based in Eagan, Minnesota, with a branch office in Sioux Falls, South Dakota. Id. ¶¶ 2, 23. Interstate is an authorized dealer of Liebherr equipment. Id. ¶ 2. Liebherr is a manufacturer of heavy equipment used in sand and gravel production with headquarters in Virginia. Id. ¶ 3.

In February 2021, Paradigm President Golden began negotiating to purchase six new Liebherr machines from Interstate and discussed the proposed transaction with Interstate's Senior Vice President Charles Weedon, branch manager Greg Swier, and salesman Mitch Meyers. Id. ¶¶ 9–10. Paradigm had specific requirements in mind for the new loaders, dozers, and an excavator, which were memorialized in emails and texts between Golden and Weedon. Id. ¶¶ 11, 20–21. On October 29, 2021, at 11:30 a.m., Weedon, on behalf of Interstate, sent to Golden specification sheets that did not match the machinery specifications required by Paradigm. Id. ¶ 22. Weedon promised that corrected specification sheets would be provided by 3:30 p.m. that day when Golden was to sign the necessary paperwork. Id.

Golden, on the afternoon of October 29, traveled to Interstate's Sioux Falls branch office to complete the transaction by paying a deposit and signing necessary paperwork. Id. ¶ 23. But when Golden arrived, the corrected specification sheets had still not been prepared. Id. Weedon

2

informed Golden that the corrected sheets could not be provided that day and emailed Interstate branch manager Swier's secretary, Julie Mork, instructing her to have Golden sign and initial the order sheets, assuring that corrections would be made the following week. Id. ¶¶ 24–25. Golden informed Swier in person and Weedon by phone that Golden was uncomfortable signing the order sheets that did not reflect the corrected specifications. Id. ¶ 26. Golden, in reliance on Weedon's assurance, signed the documents (2021 Agreement) adding the notation "PER EMAILS ETC" to incorporate the prior communications, which was approved by Swier. Id. ¶ 27. Paradigm paid Interstate $1,044,000 for the six new machines and traded in five other pieces of equipment. Id. ¶ 30. The Interstate Terms and Conditions made part of the 2021 Agreement included choice of Minnesota as the law and exclusive venue for any dispute. Doc. 17-1 at 4.

The relationship between Paradigm and Interstate under the 2021 Agreement did not start on a good note. Doc. 1 ¶ 32. Most of the machines Interstate delivered did not meet Paradigm's specifications, and two machines—the 934 Excavator and the 566 Wheel Loader—were not delivered on time. Id. ¶¶ 33–40. Paradigm experienced many problems with the heavy equipment and Interstate's servicing or lack of servicing them. Id. ¶¶ 41–46, 48–53. Paradigm sued Interstate in South Dakota state court in May 2023. Id. ¶ 55. On June 7, 2023, Golden met with Kai Friedrich and Allen Petry, representatives of Liebherr, to discuss the issues Paradigm had with the equipment and Interstate. Id. ¶ 56.

On August 24, 2023, Paradigm and Interstate entered into a settlement agreement (2023 Agreement) to terminate the state lawsuit.[1] Id. ¶ 57. The terms of the 2023 Agreement included: 1) Paradigm's acquisition of a new TA 230 Articulated Truck, which was to be delivered to

---

[1] The 2023 Agreement is quite informal, evidently negotiated between the parties without using counsel to draft it. See Doc. 17-2.

3

Vermillion, South Dakota; 2) Interstate's commitment to provide ongoing service and support for the Liebherr equipment; 3) delivery of a replacement PR736 LGP Dozer to Paradigm meeting certain specifications; and 4) resetting the warranty periods on the machines purchased under the 2021 Agreement to the date of the 2023 Agreement. Id. ¶¶ 58–63. Liebherr was not a party to the 2023 Agreement though the 2023 Agreement extended warranties on Liebherr equipment. See id. ¶ 57.

The 2023 Agreement included a release of certain legal claims: "Paradigm [] agrees that no further legal action will be pursued or taken against or between Randy Golden, Paradigm [], Interstate Companies, or any of its operating divisions to include Interstate Power Systems." Doc. 17-2 at 3. The 2023 Agreement also incorporated external provisions through the following language: "Signature below signifies approval and authorization to proceed with the purchase of equipment outlined in this proposal and acknowledges [Interstate's] terms and conditions above, including the Code of Conduct, Service Warranty, and General Terms & Conditions, which are expressly incorporated herein by reference." Id. at 4. Interstate's General Terms and Conditions contain a governing law provision: "This invoice shall be interpreted in accordance with the internal laws of the State of Minnesota . . . ." Doc. 17-3 at 2. This provision also contains a forum-selection clause: "The parties hereto submit to the exclusive jurisdiction of the courts of the State of Minnesota . . . and the Minnesota Federal Courts in connection with any dispute related to their relationship." Id.

Within days of the 2023 Agreement, Paradigm experienced problems with the equipment purchased under the 2021 Agreement. Doc. 1 ¶¶ 69–73. Paradigm discovered that the 716 LGP Dozer was not working, the 636 Crawler Loader displayed "red" error codes, and the 566 Wheel Loader would not start. Id. ¶¶ 70–77. Interstate was not responsive to Paradigm's service requests

4

and concerns. See id. ¶¶ 74–81. On August 29, 2023, Paradigm transported the 934 Excavator to Interstate's shop because it was inoperable. Id. ¶ 79.

All of the Liebherr machines Paradigm purchased have a data transfer and positioning system referred to as LiDAT. Id. ¶ 64. The LiDAT system allows service providers "to log into the controls of the equipment from any location and both read and modify parameters of machine control." Id. ¶ 65. Paradigm alleges the LiDAT system can be used to assign time restrictions or movement limitations and remotely immobilize or disable Liebherr machines. Id. ¶¶ 67–68. Paradigm believes (and Defendants adamantly deny) that the Defendants have remotely manipulated and disabled two Liebherr machines owned by Paradigm—the 566 loader and the 586 loader—and not shared data from the LiDAT system.[2]

On September 15, 2023, Golden met with Jesse Martel, a representative of Interstate, to discuss immediate service needs and expedited repair timeframes for Paradigm's equipment. Id. ¶¶ 82–85. Paradigm sent multiple requests over September and October to Interstate and Liebherr regarding service requests and ongoing problems that Paradigm was experiencing with the equipment. Id. ¶¶ 87–89. On October 16, 2023, Golden contacted Central Power Equipment located in Missouri to service the equipment but was turned away due to dealership boundaries. Id. ¶¶ 90–91. Interstate serviced the 716 LGP Dozer on October 18, 2023. Id. ¶ 94.

---

[2] During the hearing, Paradigm called mechanical engineer Richard Hall as an expert. Hall testified that his observations of video taken by Golden and his inspection of Paradigm's 586 Liebherr loader, together with his experience and training, lead him to believe that LiDAT is a generic telematics system that perhaps could disable machinery such as by shutting off the fuel delivery system. However, Hall could not give a definitive opinion on if Interstate or Liebherr did so and described further information he would need. Golden testified and plainly believes that the LiDAT system is to blame for the 586 loader and the 566 loader not functioning, including describing how the 586 loader on April 15, 2026, would only start after the LiDAT system was unplugged. Liebherr filed an affidavit of its Divisional Director Allen Petry stating that Liebherr "does not have the capability of remotely disabling machinery" and has never and would never attempt to remotely disable Paradigm's equipment. Doc. 45-1 at 2–3.

Throughout October and November, Golden contacted numerous Interstate and Liebherr representatives concerning the various error codes being displayed on the heavy equipment through the LiDAT system and requested full LiDAT reports for the equipment. Id. ¶¶ 95–96. Interstate responded by providing a "brief snapshot of the LiDAT report for the 566 Wheel Loader from August 29, 2023[,] and stated that it could not find any reports for the 636 Crawler Loader, the 934 Excavator, or the 716 LGP Dozer." Id. ¶ 96. Golden again requested LiDAT reports from Liebherr's factory in December 2023, which Liebherr refused to provide.[3] Id. ¶ 106.

Paradigm retrieved the 934 Excavator from Interstate's Sioux Falls location on November 22, 2023. Id. ¶ 102. When Paradigm attempted to use the machine, it discovered that the 934 Excavator was inoperable because the batteries were dead and would not hold a charge. Id. ¶ 103. Paradigm installed side bucket cutting edges on the 934 Excavator in February 2024 because Interstate refused to do so. Id. ¶ 107. On March 13, 2024, the 934 Excavator displayed "red" error codes. Id. ¶ 109. On April 6, 2024, Martel and Adam Brockhouse, an Interstate mechanic, came to Paradigm's facility to examine Paradigm's equipment. Id. ¶¶ 51, 111. During this meeting, it was discovered that the wiring on the 586 Wheel Loader was improperly attached and the batteries on the 934 Excavator were defective. Id. ¶¶ 112, 114.

On April 14, 2024, Golden informed Martel that Paradigm intended to move the equipment to its pit by the end of April, and that the PR736 LGP Dozer, which had not been delivered yet, was needed at the pit. Id. ¶ 115. Golden asked to use the 716 LGP Dozer that he had traded in until the new PR736 LGP Dozer arrived, which Interstate and Liebherr refused. Id. ¶ 116. The new Dozer did not arrive until the end of May 2024. Id. ¶ 120.

---

[3] During the hearing, Golden testified that he was told that he could get LiDAT reports only if Paradigm signed up for a subscription, which he was not willing to do.

In May 2024, Paradigm hired Flashback Data, LLC to forensically examine the 566 Wheel Loader to determine if the LiDAT system had been tampered with. Id. ¶ 122. Flashback Data contacted Liebherr for technical assistance, which Liebherr denied during multiple calls. Id. ¶ 123. On July 8, 2024, Golden again emailed Kai Friedrich requesting LiDAT reports and assistance. Id. ¶ 127. Golden sent a follow-up email on July 18, asking Friedrich to confirm receipt of the July 8 email; Friedrich confirmed receipt. Id. ¶ 128. On July 19, the 586 Wheel Loader would not start. Id. ¶ 129.

Paradigm brings eleven claims against Interstate and Liebherr. Doc. 1. Counts 1, 2, and 3 assert breach of contract, breach of implied covenant of good faith and fair dealing, and breach of warranty all relating to the 2023 Agreement. Id. ¶¶ 137–54. Counts 4, 5, and 6 bring claims for deceit, negligent misrepresentation, and deceptive trade practices based on Defendants' representations during the negotiations for the purchase of the 716 LGP Dozer. Id. ¶¶ 155–81. Count 7 asserts a claim for conversion alleging Interstate and Liebherr controlled the 566 and 586 Wheel Loaders. Id. ¶¶ 182–87. Count 8 alleges a violation of 18 U.S.C. § 1030. Id. ¶¶ 188–91. Count 10 asserts a cause of action for tortious interference stemming from Paradigm's inability to conduct its operations based on Defendants' actions. Id. ¶¶ 195–200. Finally, counts 9 and 11 assert stand-alone claims for injunctive relief and punitive damages. Id. ¶¶ 192–94, 201–02.

## II. Motion to Transfer

### A. Legal Standard for Motion to Transfer

Under 28 U.S.C. § 1404, "a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). District courts considering a motion to transfer under § 1404(a) "must evaluate both the convenience of the parties and various public-interest considerations."

<u>Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.</u>, 571 U.S. 49, 62 (2013). "Factors relating to the parties' private interests include relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." <u>Id.</u> at 62 n.6. (cleaned up and citation omitted). "Public-interest factors may include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law." <u>Id.</u> (cleaned up and citation omitted).

The analysis of a motion to transfer is altered in three ways "when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'" <u>Id.</u> at 63 (quoting <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 31 (1988)). "First, the plaintiff's choice of forum merits no weight," and "the plaintiff must bear the burden of showing why the court should not transfer the case to the forum to which the parties agreed." <u>Id.</u> at 63–64. "Second, a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests." <u>Id.</u> at 64. "As a consequence, a district court may consider arguments about public-interest factors only. Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." <u>Id.</u> (internal citation omitted). "Third, when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." <u>Id.</u> "When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer

8

the case to the forum specified in that clause.  Only under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion be denied." Id. at 62.

Paradigm does not argue that the forum-selection clause embedded in the General Terms and Conditions itself is unjust or unreasonable.  Doc. 26 at 1–6.  Instead, Paradigm argues that enforcement of the forum-selection clause and transfer is improper for three reasons: 1) Interstate cannot enforce the forum-selection clause because Interstate entered into the contract to commit fraud; 2) the scope of the forum-selection clause is limited to the purchase of the new articulated truck as part of the 2023 Agreement, and Paradigm is willing to dismiss claims related to that truck to retain venue in South Dakota; and 3) the forum-selection clause does not apply to the noncontractual claims. Id.

### B.  Enforceability of the Forum-Selection Clause

Paradigm first argues that Interstate cannot enforce the forum-selection clause because a copy of Interstate's General Terms and Conditions was not provided to Paradigm when it signed the 2023 Agreement. Id. at 6.  Thus, Paradigm contends that the inclusion of the forum-selection clause was the product of fraud or coercion. Id.  Interstate counters that the 2023 Agreement expressly incorporates its General Terms and Conditions, which are available on its website and were available to Paradigm there and as part of the 2021 Agreement. See Doc. 29 at 8.

Whether to apply state or federal law to determine the enforceability of a forum-selection clause is the initial question.  "Because the enforceability of a forum selection clause concerns both the substantive law of contracts and the procedural law of venue, there is some disagreement among the circuits over whether state or federal law applies." Servewell Plumbing, LLC v. Fed. Ins. Co., 439 F.3d 786, 789 (8th Cir. 2006) (cleaned up and citations omitted).  The Eighth Circuit declined to resolve the issue in Servewell Plumbing, but continued to apply federal law,

9

acknowledging the applicable states followed the federal standard. Id. at 789. This Court will likewise apply federal law since both South Dakota and Minnesota apply the federal standard. See O'Neill Farms, Inc. v. Reinert, 780 N.W.2d 55, 58 (S.D. 2010) (applying federal standard for validity and enforceability of forum-selection clauses); Maslowski v. Prospect Funding Partners LLC, 890 N.W.2d 756, 762–63 (Minn. Ct. App. 2017) (same).

"[F]orum selection clauses are prima facie valid and are enforced unless they are unjust or unreasonable or invalid." Servewell Plumbing, 439 F.3d at 789 (cleaned up and citation omitted). "A 'forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion.'" Marano Enters. of Kan. v. Z-Teca Rests., L.P., 254 F.3d 753, 757 (8th Cir. 2001) (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 n.14 (1974)). Yet, "[b]asic contract principles instruct that where a writing refers to another document, that other document, . . . becomes constructively a part of the writing, and in that respect the two form a single instrument. The incorporated matter is to be interpreted as part of the writing." Halbach v. Great-West Life & Annuity Ins. Co., 561 F.3d 872, 876 (8th Cir. 2009) (cleaned up and citation omitted). "Terms incorporated by reference are not effectively communicated unless the reference is clear and unequivocal, and the terms of the incorporated document are known or easily available to the contracting parties." BSI Group LLC v. EZBanc Corp, 122 F.4th 712, 715 (8th Cir. 2024) (cleaned up and citation omitted). See also Dakota Foundry, Inc. v. Tromley Indus. Holdings, Inc. 737 F.3d 492, 495 (8th Cir. 2013); Granite Re, Inc. v. N. Lines Contracting, Inc., 478 F. Supp. 3d 772, 777–78 (D. Minn. 2020).

Here, Paradigm admits to signing the 2023 Agreement, which contains language incorporating Interstate's General Terms and Conditions. Paradigm was not given a copy of Interstate's General Terms and Conditions when the 2023 Agreement was signed. Doc. 26 at 6.

10

The 2023 Agreement, however, expressly incorporates Interstate's General Terms and Conditions by reference. Doc. 17-2 at 4. Interstate included the entirety of its Terms and Conditions in the parties' 2021 Agreement, including a link to Interstate's website where they can be found, and these 2021 Terms and Conditions appear substantially identical to the 2023 General Terms and Conditions. Doc. 17-1 at 2–4; Doc. 17-3 at 1–2. Since the 2023 Agreement incorporates Interstate's General Terms and Conditions by reference and those terms were known to Paradigm and made available on Interstate's website, they are terms of the 2023 Agreement and enforceable by Interstate against Paradigm. See BSI Group LLC, 122 F.4th at 715; Halbach, 561 F.3d at 876; Granite Re, 478 F. Supp. 3d at 777–78. Likewise, the same provision of the 2023 Agreement incorporates by reference the Code of Conduct and Service Warranty, which may prove useful to Paradigm in its claims, particularly because Paradigm is alleging breach of warranty arising from the 2023 Agreement.

## C. Scope of the Forum-Selection Clause

Paradigm next argues that the forum-selection clause made part of the 2023 Agreement only applies to Paradigm's purchase of the new articulated truck and not to the remainder of the 2023 Agreement. Doc. 26 at 2. Paradigm argues that its claims in its proposed Amended Complaint (omitting portion concerning the TA 230 Articulated Truck in breach of 2023 Agreement claim), Doc. 27-1, are not subject to the forum-selection clause and are properly brought in this Court. Doc. 26 at 2–3; see also Doc. 28 at 1–2. In a similar vein, Paradigm contends that even if the forum-selection clause applies to all contractual claims, it is not broad enough to apply to its tort claims. Doc. 26 at 3–6. Interstate counters that its forum-selection clause applies to the entirety of the agreement and is broad enough to include Paradigm's tort claims. Doc. 29 at 3–6.

11

"The enforceability and interpretation of forum-selection clauses are distinct concepts." Smart Comm'ns Collier Inc. v. Pope Cnty. Sheriff's Off., 5 F.4th 895, 897 n.2 (8th Cir. 2021) (citing Martinez v. Bloomberg LP, 740 F.3d 211, 217 (2d Cir. 2014)). So, this Court considers what law to apply to the interpretation of the forum-selection clause. The Eighth Circuit noted the circuit split on which law to apply to the interpretation of a forum-selection clause in Smart Communications. 5 F.4th at 897 n.2 (collecting cases). The Eighth Circuit declined to expressly rule on the issue because both parties assumed Arkansas law controlled and neither party disputed that the application of another body of law would affect the outcome. Id. Here, both parties use federal common law to determine whether tort claims are covered by the forum-selection clause citing this Court's prior decision in Viet Family, Inc. v. Freidel, 754 F. Supp. 3d 840 (D.S.D. 2024). See Doc. 26 at 3–4; Doc. 29 at 3–6.

The Eighth Circuit uses a two-step approach to determine whether tort claims are covered by a forum-selection clause. "[F]irst the court considers the specific language of the forum selection clause . . . ." All. Commc'ns Co-op., Inc. v. Glob. Crossing Telecomms., Inc., Nos. Civ. 06-4221, 06-3023, 2007 WL 1694271, at *12 (D.S.D. July 2, 2007). "Whether tort claims are to be governed by forum selection provisions depends upon the intention of the parties reflected in the wording of particular clauses and the facts of each case." Terra Int'l, Inc. v. Miss. Chem. Corp., 119 F.3d 688, 693 (8th Cir. 1997) (citation omitted). When a forum-selection clause unambiguously applies to tort claims or excludes tort claims, the language controls. See High Plains Constr., Inc. v. Gay, 831 F. Supp. 2d 1089, 1100 (S.D. Iowa 2011) (finding tortious interference claim fell within forum-selection clause where there was "no ambiguity in the meaning of the forum selection clause").

12

However, when the language does not clearly indicate the intended scope of the clause, the Eighth Circuit has recognized three "generally applicable tests" adopted by other courts of appeals to help guide the determination. Terra Int'l, 119 F.3d at 694. Courts consider "1) whether the tort claims 'ultimately depend on the existence of a contractual relationship between the parties;' 2) whether resolution of the claims 'relates to interpretation of the contract;' and 3) whether the claims 'involve the same operative facts as a parallel claim for breach of contract.'" Beckley v. Auto Profit Masters, L.L.C., 266 F. Supp. 2d 1001, 1005 (S.D. Iowa 2003) (quoting Terra Int'l, 119 F.3d at 694–95). Although the Eighth Circuit applied only the "same operative facts" test in Terra International, "the court did not embrace one specific test—instead indicating that each may be instructive depending on the facts of the case." All. Commc'ns Co-op., 2007 WL 1964271, at *11.

The 2023 Agreement stated: "Signature below signifies approval and authorization to proceed with the purchase of equipment outlined in this proposal and acknowledges [Interstate's] terms and conditions above, including the Code of Conduct, Service Warranty, and General Terms & Conditions, which are expressly incorporated herein by reference." Doc. 17-2 at 4. Paradigm contends "[t]his language establishes that the General Terms and Conditions apply, not to the proposal as a whole (including the promise to reinstate warranties or provide service and support), but [solely] to the purchase of equipment." Doc. 26 at 2. The only piece of equipment purchased under the 2023 Agreement was the TA 230 Articulated Truck, thus, Paradigm believes that the forum-selection clause "appl[ies], at most, to this purchase." Id. Under Paradigm's view, the clause incorporating its General Terms and Conditions is strictly limited to the preceding clause for "the purchase of equipment outlined in this proposal." See Doc. 17-2 at 4.

13

Interstate counters that its General Terms and Conditions "apply to the entirety of the parties' relationship and all potential claims." Doc. 29 at 2. Interstate argues that the use of the conjunction "and" in the provision at issue establishes that the signature had two distinct effects: 1) "signifies approval and authorization to proceed with the purchase of equipment" and 2) "acknowledges . . . terms and conditions above, including the Code of Conduct, Service Warranty, and General Terms and Conditions, which are expressly incorporated by reference." Id. at 3. Interstate reasons that the clause incorporating Interstate's General Terms and Conditions is not limited by the preceding clause for the purchase of equipment but instead applies to the entirety of the 2023 Agreement. See id. Interstate points to other language contained in the 2023 Agreement: "Signed acceptance of [Interstate's] terms & conditions for the proposal will also confirm no further legal action . . . ." Id. (cleaned up and citation omitted). Interstate argues that this additional language reinforces the argument that the General Terms and Conditions apply to the entire proposal constituting the 2023 Agreement, not the purchase of the articulated truck. Id.

This Court agrees with Interstate's interpretation. "'And,' in grammatical terms, is of course a conjunction—a word whose function is to connect specified terms." Pulsifer v. United States, 601 U.S. 124, 133 (2024). The use of the conjunctive word "and" here connects the two verbs "signifies" and "acknowledges" in the provision. The conjunction of these two verbs shows that the clause at issue meant signing the agreement had two effects: 1) it signified approval of the purchase of equipment and 2) it acknowledged Interstate's General Terms and Conditions, Code of Conduct, and Service Warranty, which were expressly incorporated by reference. Id. at 139 (noting Congress's "use of the conjunctive word 'and' would reflect the needed conjunction of three requirements"). Other language in the 2023 Agreement furthers this interpretation: "Signed acceptance of Interstate Power Systems terms & conditions *for this proposal* . . . ." Doc. 17-2 at

14

1. Interstate's General Terms and Conditions applied to the entirety of the proposal, not solely the purchase of the articulated truck.

Next, this Court must determine whether the forum-selection clause encompasses Paradigm's tort claims. The forum-selection clause states: "The parties hereto submit to the exclusive jurisdiction of the courts of the State of Minnesota . . . and the Minnesota Federal Courts in connection with any dispute related to their relationship." Doc. 17-3 at 2. The plain language of the forum-selection clause encompasses Paradigm's tort claims. See High Plains Const., 831 F. Supp. 2d at 1100 (finding that the language "[a]ny dispute arising under or in connection with this agreement or related to any matter which is the subject of this agreement" includes claim of tortious interference with contractual relationships claim); DesignSense, Inc. v. MRIGlobal, No. 4:13-CV-010, 2013 WL 3205569, at *2 (W.D. Mo. June 25, 2013) (finding "although the language of the forum selection clause does not state that it applies to tort claims, its broad wording weighs in favor [of] applying it to Plaintiff's tort claims" where forum selection clause encompassed "any dispute or claim *pertaining* to this subcontract"); Minn. Supply Co. v. Mitsubishi Caterpillar Forklift Am., 822 F. Supp. 2d 896, 912–13 (D. Minn. 2011) (holding forum-selection clause which encompassed actions "pertaining" to the contract also covered a claim for tortious interference). The forum-selection clause's broad language to include "any dispute related to their relationship" covers Paradigm's tort claims. See Doc. 17-1 at 4; High Plains Const., 831 F. Supp. 2d at 1100; DesignSense, Inc., 2013 WL 3205569, at *2; Minn. Supply Co., 822 F. Supp. 2d at 912–13.

**D. Transfer Analysis**

Atlantic Marine holds that a forum-selection clause should be enforced against contracting parties by courts except "under extraordinary circumstances." See 571 U.S. at 581. Here, Liebherr is not a contracting party to the 2023 Agreement. Thus, the forum-selection clause does not dictate

15

transfer of the claims against Liebherr. Although the Eighth Circuit has not considered the application of Atlantic Marine to a case involving non-contracting parties, the Fifth Circuit and Third Circuit have. See In re: Howmedica Ostenoics Corp, 867 F.3d 390 (3d Cir. 2017); In re Rolls Royce Corp., 775 F.3d 671 (5th Cir. 2014). The Fifth Circuit in In re Rolls Royce adopted a three-step test to determine whether to transfer claims against non-contracting parties under Atlantic Marine, while the Third Circuit in In re: Howmedica expanded on the Fifth Circuit's test adopting a four-step test. 867 F.3d at 403–05.

Under the Third Circuit's four-step approach, the court first "assumes that Atlantic Marine applies to parties who agreed to forum-selection clauses and that, '[i]n all but the most unusual cases,' claims concerning those parties should be litigated in the fora designated by the clauses." Id. at 404 (quoting Atl. Marine, 571 U.S. at 66). "Second, the court performs an independent analysis of private and public interests relevant to non-contracting parties, just as when adjudicating a § 1404(a) transfer motion involving those parties in the absence of any forum-selection clauses." Id. "If, at this juncture, the Step One and Step Two analyses point to the same forum, then the court should allow the case to proceed in that forum, whether by transfer or by retaining jurisdiction over the entire case and the transfer inquiry ends there." Id.

"Third, if the Step One and Step Two analyses point different ways, then the court considers severance." Id. Severance may be appropriate "to preserve federal diversity jurisdiction; to cure personal jurisdiction, venue, or joinder defects; or to allow subsequent impleader under Federal Rule of Civil Procedure 14." Id. "In other cases, severance is clearly disallowed, such as when a party is indispensable under Federal Rule of Civil Procedure 19(b)." Id. "[I]n cases where severance is neither clearly warranted nor clearly disallowed and is therefore committed to the court's discretion . . . , the court goes on to select the appropriate fora based on a combination of

16

interests addressed at the next step." Id. at 405. Finally, "a district court exercises its discretion . . . in choosing the most appropriate course of action, but it measures its decision against two key sets of interests." Id. (internal citations omitted).

> On the one hand, the court considers efficiency interest in avoiding duplicative litigation taking into account case management techniques that can reduce inefficiencies accompanying severance, as well as any other public interests that may weigh against enforcing a forum-selection clause. On the other hand, the court also considers the non-contracting parties' private interests and any prejudice that a particular transfer decision would cause with respect to those interests.

Id. (cleaned up and citations omitted).

Under the first step of the In re: Howmedica framework, the proper forum for claims between Paradigm and Interstate is Minnesota because there is a valid and enforceable forum-selection clause covering all claims between the two parties. Under step two, this Court conducts an independent § 1404(a) analysis of the claims between Paradigm and Liebherr. Under an independent § 1404(a) analysis, the proper forum for claims between Paradigm and Liebherr is South Dakota. First, this Court must give some weight to Paradigm's choice of forum. Atl. Marine, 571 U.S. at 62 n.6. Next, the private interest factors favor South Dakota as the forum because the transactions and use of equipment at issue here, and therefore, the majority of relevant witnesses and sources of proof are located in South Dakota and not Minnesota. Finally, the public interest factors favor a South Dakota forum. The controversy largely stems from events in South Dakota, favoring a South Dakota forum. Additionally, Paradigm's tort claims against Liebherr are not governed by the 2023 Agreement's choice of law provision because Liebherr is not a party to the 2023 Agreement. See Doc. 1 ¶¶ 137–41 (excluding Liebherr in breach of contract claim). Thus, "the interest in having the trial of a diversity case in a forum that is at home with the law," Atl. Marine, 571 U.S. at 62 n.6, would favor South Dakota for claims between Paradigm and Liebherr. Step one and step two point to different forums.

Under step three, this Court considers severance if it is clearly appropriate "to cure personal jurisdiction, venue, or joinder defects," or "clearly disallowed, such as when a party is indispensable." In re: Howmedica, 867 F.3d at 404. No parties argue that severance is necessary to cure any jurisdictional defects nor clearly disallowed because of an indispensable party. Indeed, Liebherr provided notice to this Court that it would submit to jurisdiction in Minnesota for purposes of this case if it were transferred to Minnesota. Doc. 57.

Under step four, this Court evaluates efficiency interests and the non-contracting party's private interests. Here, efficiency interests weigh heavily in favor of transferring the entire case to the District of Minnesota. Transferring the entire case would avoid duplicative litigation, as Paradigm's claims against both Interstate and Liebherr involve substantially identical facts and are somewhat interrelated. Additionally, a transfer would be in the interest of the non-contracting party, Liebherr, because it has consented to the transfer. Doc. 57. Paradigm has failed to make a showing that "the contracting parties' settled expectations is 'overwhelmingly' outweighed by the countervailing interests." In re: Howmedica, 867 F.3d at 405 (quoting Atl. Marine, 571 U.S. at 67). Therefore, it is appropriate to grant Interstate's Motion to Transfer and to transfer the case in its entirety to the United States District Court for the District of Minnesota.

## III. Remaining Motions

Because Interstate and Paradigm are governed by a venue selection clause for a Minnesota court to determine "any dispute related to their relationship" and because transfer of this entire case to the District of Minnesota is appropriate, this Court declines to address the merits of the remaining pending motions. See Mungovan v. Wyndham Vacation Resorts, Inc., No. 0:25-cv-61, 2025 WL 1682899, at *7 (D. Minn. June 16, 2025) (leaving motion to dismiss for receiving court to rule on); Retsel Corp. v. NDN Collective, No. 5:24-CV-05070, 2025 WL 1383215, at *7 (D.S.D.

18

May 13, 2025) (declining to address merits of motion to dismiss for failure to state a claim upon granting motion to transfer).

## IV. Conclusion

For the reasons explained above, it is hereby

ORDERED that Interstate's Motion to Transfer, Doc. 15, is granted to the extent that it seeks to transfer this case to the District of Minnesota. It is further

ORDERED that this Court otherwise leaves ruling on the remaining pending motions to the transferee court. It is finally

ORDERED that the Clerk of Court is directed to take all steps necessary to effectuate this transfer in an expeditious fashion.

DATED this __14ᵗʰ__ day of May, 2026.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

19